Raymond W. Sheets v. Security First Mortgage Co., et al.
O. G. Nelson, et al., Appellees, v. Max Liebling, et al., Cross-Defendants. Clarendon Mower, Appellant.

Gen. No. 9,214.

224

Opinion filed September 28, 1937. Rehearing denied January 23, 1938.

HYER & GILL, of Rockford, for appellant.

WILBUR E. JOHNSON, STANLEY H. GUYER, E. E. FELL and MILLER & THOMAS, all of Rockford, for appellees; CHARLES A. THOMAS, of Rockford, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court.

Raymond W. Sheets, trustee, filed his complaint in the circuit court of Winnebago county, seeking to have a 99-year lease upon certain property located in Rockford and described in the complaint declared null and void, and a trust deed thereon executed on May 1, 1929 to secure the payment of notes aggregating $37,500 decreed to be no longer a lien upon the property, and that the title thereto be confirmed in him. This complaint made O. G. Nelson, L. J. Wood, Wilford C. Roland, Axel Swenson and Wilbur E. Johnson, describing them as a bondholders' committee, and also Ferdinand Ringoen, receiver for the Security National Bank, Harry Scandroli, Rose Scandroli, The Swords Company, Security First Mortgage Company, trustee, Penfield Mower, Robinson H. Mower and Clarendon Mower, trustees under the Annie Penfield Mower Trust, Max Liebling, Leona Liebling and several other

parties, whose rights and interests are not herein involved, parties defendant. Nelson, Wood, Roland, Swenson and Johnson, as the bondholders' committee, filed their answers and a counterclaim as did also Ferdinand Ringoen, receiver for the Security National Bank, Harry Scandroli, Rose Scandroli and The Swords Company.

After the issues had been made up, a hearing was had, resulting in a decree upon the original complaint granting the relief therein sought. The decree also found that the Mid States Industrial Corporation is the successor to The Swords Company, one of the counterclaimants herein, and that it is entitled to all the rights of The Swords Company in this cause. By the decree a money judgment was rendered in favor of said Industrial Corporation and against Clarendon Mower personally for $10,052.40. The decree also found that the said Clarendon Mower was personally liable to counterclaimants, Nelson, Wood, Roland, Swenson and Johnson, as a bondholders' committee, in the sum of $24,664.21, and was personally liable to counterclaimants, Harry and Rose Scandroli, in the sum of $3,737, and to the counterclaimant, receiver of the Security National Bank, in the sum of $5,854.63. Upon these findings the court rendered a money decree in favor of each of these counterclaimants and against the said Clarendon Mower for these respective amounts and it is from this decree that Clarendon Mower appeals.

The evidence discloses that on July 27, 1928, Christian F. Henry executed a 99-year lease to Max Liebling to certain premises in Rockford upon which in April, 1929 there was in the process of construction a building later known as the Lafayette Hotel Annex. The Security Building Company and The Swords Brothers Company, two construction firms, had furnished labor and material for the construction of this building to

Max Liebling and on April 22, 1929 Liebling entered into a written agreement with the Security Building Company, The Swords Brothers Company, (later The Swords Company to which the Mid States Industrial Corporation is successor) and the Security First Mortgage Company by the provisions of which, said mortgage company, as trustee, obligated itself to negotiate a bond issue in the principal sum of $37,500 to be secured by the leasehold estate of Liebling, that upon the sale of said bonds the proceeds thereof were to be used to complete the construction of the annex building and the balance was to be applied upon the indebtedness due the Security Building Company and to The Swords Brothers Company. It was recognized that the amount which the Security Building Company and the Swords Brothers Company would receive would not be sufficient to liquidate the amount due these companies and Liebling, therefore, obligated himself to execute bonds secured by a lien upon the leasehold estate, junior only to the lien of the said $37,500 bond issue for such sum as would remain due these companies.

Pursuant to the terms of this agreement, a trust indenture and bonds were executed bearing the date of May 1, 1929. The bonds aggregated the said sum of $37,500 and matured in amounts of $5,000 annually, with a final maturity of $7,500 due May 1, 1936. Of the principal sum, $27,500 remained unpaid at the time of the institution of this proceeding. These bonds so secured were sold to various persons and at the time the complaint was filed were held and owned by the several counterclaimants except Swords Brothers Company. This counterclaimant (Mid States Industrial Corporation, successor to said Swords Brothers Company) at the time of the institution of this proceeding held a note, executed by Max Liebling, to said Swords Brothers Company in the sum of $7,291.19, dated April 22, 1929 and which was executed by Liebling to

said Swords Brothers Company pursuant to the agreement of April 22, 1929. The other construction firm, the Security Building Company, is not a party to this proceeding inasmuch as its indebtedness has been settled. The agreement of April 22, 1929 provided that Liebling would assign his 99-year leasehold to Security First Mortgage Company to secure the payment of said bond issue and for the benefit of the bondholders under said trust indenture and for the benefit of Swords Brothers Company and said Security Building Company under their junior lien until all indebtedness due should be fully paid and discharged.

On October 17, 1929, Max Liebling and Leona Liebling, his wife, executed the following assignment, viz.: "For and in consideration of the sum of One Dollar and other good and valuable considerations to us in hand paid, receipt of which is hereby acknowledged, we, Max Liebling and Leona Liebling, husband and wife, of Rockford, Illinois, do hereby quit claim, assign, sell, transfer and set over unto Penfield Mower, Robinson H. Mower and Clarendon Mower, Trustees, known as Annie Penfield Mower Trust, all of our right, title and interest of every kind and nature in and to a certain ninety-nine year lease, bearing date July 27, 1928, between Christian F. Henry, a widower, as Lessor, and Max Liebling as Lessee, which lease was filed for record in the office of the Recorder of Deeds of Winnebago County, Illinois, on December 11, 1928, at nine o'clock A. M. in Book 332 of Mortgages, page 124, and also all of our right, title and interest of every kind and nature in and to a certain contract and trust agreement entered on the 22nd day of April, 1929, between Max Liebling, Security Building Company, Swords Bros. Company and Security First Mortgage Company, covering said ninety-nine year leasehold interest on the property known and described as: Lot Seven (7) in Block Twenty Seven (27) as designated upon the Plat of that part of the Town (now City) of Rockford

on the West side of Rock River. It is expressly understood that this assignment and sale is made subject to all of the terms, conditions, restrictions, covenants and agreements contained in said contract and trust agreement, and to all of the encumbrances on said property and leasehold therein set forth, and to all of the liabilities therein set forth, and upon the further express agreement that the assignees herein will assume and accept all of the conditions, restructions, covenants, agreements, encumbrances and liabilities as set forth in said contract and trust agreement, and will consent and agree to carry same out and to perform same according to the terms of said contract and trust agreement as a part of the purchase price. It is further expressly understood that the assignees herein will consent and agree to hold the assignors herein from and after the date of this assignment free and harmless from any and all claims, liabilities or encumbrances as set forth in said contract and trust agreement.''

It further appears from the evidence that the Security First Mortgage Company, Security Building Company and the Swords Brothers Company executed their written consent to said assignment as follows: ''We, the undersigned, Security First Mortgage Company, an Illinois Corporation, Trustee, Security Building Company, an Illinois Corporation, and Swords Bros. Company, an Illinois Corporation, parties in and to a certain contract and trust agreement entered into between us and Max Liebling on April 22nd, 1929, do hereby irrevocably consent and agree to the assignment, sale, transfer of the interests of Max Liebling and Leona Liebling, his wife, in and to the ninety-nine year leasehold in, on and to the real property and improvements thereon as described in said trust agreement, and to all of their right, title and interest in and to said trust agreement, to Penfield Mower, Robinson

H. Mower and Clarendon Mower, Trustees, known as Annie Penfield Mower Trust, it being expressly understood that the consent of the undersigned is made upon the condition that the assignees assume and accept all of the obligations of the said Max Liebling and Leona Liebling, his wife, under the contract and trust agreement above referred to, as part of the purchase price, and agree to carry out the trust agreement in all of its conditions and terms."

The acceptance of said assignment is as follows: "The undersigned, Annie Penfield Mower Trust, by Clarendon Mower, Trustee, does hereby irrevocably consent to and accept the assignment of Max Liebling and Leona Liebling, his wife, of all of their right, title and interest in and to a certain ninety-nine year leasehold on the following described property: Lot Seven (7) in Block Twenty-seven (27) as designated upon the Plat of that part of the Town (now City) of Rockford on the West side of Rock River, laid out on the West part of the South West fractional quarter of Section number 23 Township 44 North Range 1 East of 3rd Principal Meridian, which lease bears date July 27, 1928, and is recorded in Book 332 of Mortgages, page 124 in the Recorder's Office of Winnebago County, Illinois, and all of their right, title and interest in and to the trust agreement and contract entered into between Max Liebling, Security First Mortgage Company, Swords Bros. Company and Security Building Company on April 22, 1929, covering the above described property. And does hereby for and in consideration of said assignment and sale and as part of the purchase price thereof, irrevocably bind itself and agree to carry out and does hereby assume all of the conditions and agreements, encumbrances and obligations as set forth in said contract and trust agreement, according to its terms. And does hereby assume all

of the obligations of Max Liebling and Leona Liebling therein set forth, covering said property and leasehold, and does hereby agree to hold said Max Liebling and Leona Liebling free and harmless from and after the date of this acceptance from any and all of the encumbrances and obligations as set forth in said contract and trust agreement. Dated this 17th day of October, A. D. 1929. Annie Penfield Mower Trust By Clarendon Mower Trustee. (Annie Penfield Mower Trust Trustee's Seal).''

Subsequent to said assignment and the acceptance thereof, Clarendon Mower collected the rentals from the property and applied the same regularly upon the indebtedness as provided in the contract of April 22, 1929, until default was made under the bond issue, which occurred in May, 1932. These rentals were used to pay the interest on the bond issue and out of it, as already stated, $10,000 of the principal was retired by Clarendon Mower.

It further appears from the evidence that on the 15th day of December, 1927 Annie Penfield Mower executed the trust agreement involved herein. By its terms it conveyed a considerable amount of real and personal property to Penfield Mower, Robinson H. Mower and Clarendon Mower as trustees and authorized and directed them to take possession of said property and to sell, convey, invest, reinvest and vary the investments and reinvestments as they, in their own discretion, should desire and to the same extent that any owner could deal with his own property. The trustees were further granted full power to encumber, mortgage, pledge or otherwise dispose of said trust estate and provided that in no case should anyone dealing with said trustees in relation to the trust estate be obliged to see to the application of the purchase money or be obliged to see that the terms of the trust had been complied with, or be obliged to inquire into the expedi-

ency, legality or propriety of any act of the trustees. This trust agreement further provided that any action, contract, deed, trust deed, mortgage, lease or other instrument in writing executed by or any action taken by said trustees in relation to said property should be conclusive evidence in favor of every person dealing with said trustees that at the time of the action the trust agreement was in full force and effect, that such action was taken in accordance with the trusts, conditions, limitations and terms contained in the trust agreement and that the trustees were duly authorized and empowered to act and execute such deed, trust deed, lease, mortgage or other instrument. This trust agreement further provided that the income from such trust property should be used for the support and maintenance of Annie Penfield Mower during her lifetime and the balance, not so used, should be distributed equally between Penfield Mower, Robinson H. Mower and Clarendon Mower. The instrument further provided that upon the death of the donor the trust should be liquidated and the corpus divided between the said Penfield Mower, Robinson H. Mower and Clarendon Mower. The trust agreement further provided that the trustees should procure a seal with the words "Annie Penfield Mower Trust, Trustees' Seal," which shall appear upon all conveyances and other instruments dealing with third persons, and further provided that while a majority of the trustees is necessary for any trustees' action, however, inasmuch as Penfield Mower resided in Massachusetts, Robinson H. Mower in California and Clarendon Mower in Rockford, Illinois and is by reason thereof the only resident trustee, it was determined advisable to authorize Clarendon Mower alone to sign the trust name and execute warranty deeds, contracts, quit claim deeds, mortgages or other instruments in writing pertaining to the real estate of the trust.

As before stated, the circuit court refused to subject the trust assets to the payment of the amount found due the counterclaimants and exonerated the nonresident trustees from any personal liability. From that portion of the decree, which refused to subject the trust assets to the satisfaction of the amount found due the counterclaimants, they have perfected a cross appeal and insist that the Annie Penfield Mower Trust is liable for the payment of the amounts so found due since the obligations were contracted by Clarendon Mower pursuant to authority granted him in the trust agreement. Clarendon Mower was the only resident trustee. There is nothing in the trust agreement which authorized him to execute for or on behalf of his trust the instruments in question in this case. From the evidence it appears that Clarendon Mower undertook to enter into and close a transaction for the purchase of a valuable property and to subject his trust to the payment of extensive obligations. Before he could legally do so, he must have been given such power clearly and affirmatively by the instrument establishing his trust. This instrument vested in the trustees jointly a very broad discretionary authority to invest, handle and reinvest the property which constituted the corpus of the trust, but this power and authority was vested in them jointly and not individually. For instance the 16th paragraph provided: "A majority of said trustees shall be necessary for any trustees' action" except Clarendon Mower, in the name of the trust and in the name of the other trustees, may "sign all deeds, conveyances, mortgages, assignments, contracts or other instruments in writing of any kind pertaining to the real estate of said trust estate and his signature with the trustees' seal attached shall be a valid and complete signature by the said trustees and the trust estate." A consideration of this provision indicates clearly that the donor had no intention whatever of fixing discretion-

ary authority in one trustee. By this clause she provided that a majority of the trustees should be necessary for each trustee's action except the purely ministerial action of signing and affixing the form of the signature. In the case of *Northern Trust Co. of Chicago v. Thompson,* 245 Ill. App. 20, the court used the following language, viz.: "In 26 R. C. L. 1372, § 232, it is said: 'It is an elementary principle in the law of trusts that in the execution of a trust, the trustee is bound to comply strictly with the directions contained in the trust instrument, defining the extent and limits of his authority, and the nature of his powers and duties.' In 3 Pomeroy's Eq. Juris. (4th Ed.), § 1062, it is said: 'The trust itself, whatever it be, constitutes the charter of the trustee's powers and duties; from it he derives the rule of his conduct; it prescribes the extent and limits of his authority; it furnishes the measure of his obligations.' In 2 Perry on Trusts (6th Ed.), § 475, it is said: 'In a court of law, the trustee is the absolute owner of the estate, and he can exercise all the powers of ownership; . . . but in equity the cestui que trust is the owner, and the question in equity is, how far the trustee can act without exceeding his powers, and rendering himself responsible to the cestui que trust, . . . In trusts of a more particular and active kind, the general power of the trustee is limited to the exact performance of the duty imposed upon him. The duty and power given in such trusts must be strictly performed.' " In 1 Perry on Trusts (6th Ed.), sec. 411, cited with approval in *Dingman v. Boyle,* 285 Ill. 144, it is said: "Where there are several co-trustees, they all form, as it were, one collective trustee, therefore they must perform their duties in their joint capacity, even in making a purchase. In law there is no such person as an acting trustee apart from his co-trustees. If one trustee who has accepted refuses to join in the proposed act, or is incapable, the

others can not proceed without him but an application must be made to the court."

It is not necessary for us to determine whether the trustees under the trust agreement had authority to purchase this leasehold estate or to assume the payment of the incumbrances and obligations placed thereon. Granting that they were so authorized, it does not follow that one trustee had any such power. What the trust instrument did provide was that a majority of the trustees shall concur in any action in order to bind the trust, that the trustees jointly controlled the investment, reinvestment and disposal of the trust assets, but that the resident trustee had the authority to execute the instruments pertaining to the real estate of the trust. Such is the meaning of the language used. Furthermore, the trust agreement provided that the signature of the resident trustee should be in the name of the trust estate and the other trustees. The acceptance signed by Clarendon Mower was signed in the name of the trust by the resident trustee and not signed in the name of the other trustees. Counsel for cross-appellants argue that this same paragraph of the trust agreement provides that the signature of the resident trustee, when so attached, shall be binding upon the trustees and trust estate. This means, when taken in connection with the language that precedes, that when an instrument, the terms of which have been agreed upon and authorized by a majority of trustees is so executed that then the signature of the resident trustee is an effective signature to the transaction. We think the chancellor very properly exonerated the non-resident trustees from any liability herein and correctly held that the trust assets are not subject to the payment of the several amounts found due the counterclaimants and correctly refused to make said money judgments a lien upon the assets of the Annie Penfield Mower Trust.

The question then remains whether it was error for the chancellor in this proceeding to decree that Clarendon Mower was personally liable to the several counterclaimants, appellees herein, upon said contract of acceptance and to decree a money judgment against him personally. The determination of this question involves the construction of the assignment to Penfield Mower, Robinson H. Mower and Clarendon Mower, trustees, by Max Liebling and Leona Liebling and the acceptance thereof by Clarendon Mower, trustee, on October 17, 1929. In support of their contention counsel for appellant insist that the lower court never acquired jurisdiction of the appellant, Clarendon Mower, in his individual capacity and never acquired jurisdiction of the subject matter. The record discloses that following the filing of the original complaint, a summons was issued naming Security First Mortgage Company, trustee, Max Liebling, Leona Liebling, Penfield Mower, Robinson H. Mower and Clarendon Mower, trustees under the Annie Penfield Mower Trust, and others as defendants. The return of the sheriff discloses that the summons was duly served by reading the same to the within named Clarendon Mower, trustee, under the Annie Penfield Mower Trust, on August 7, 1934. This defendant answered the original complaint, his answer commencing as follows: "This defendant, for himself alone, as trustee under said Annie Penfield Mower trust, answering the complaint says." The original counterclaims prayed that the court should determine the amount due the counterclaimants upon their several bonds and that Max Liebling, Leona Liebling, Penfield Mower, Robinson H. Mower and Clarendon Mower, trustees under the Annie Penfield Mower Trust, be adjudged to be personally liable to the counterclaimants for the payment of the sums so found to be due. The answer of appellant to the several counterclaims contains the following: "Clarendon

Mower, Trustee, solely in his own behalf and not for either or both of the other trustees, says . . . And this defendant further answering denies that the said Annie Penfield Mower Trust or the trustees thereof, either individually or jointly, assumed or agreed to pay or become liable for, personally or otherwise, the bonds in question in this case.'' While appellant insists that he never answered or otherwise entered his appearance as an individual, it is apparent from the pleadings that the counterclaimants were seeking to recover a personal judgment against him and he denied the allegations of these counterclaims and insisted that he was not personally liable. With the record in this condition, it is immaterial, we think, whether process was personally served upon him or not inasmuch as he, by his reply to these counterclaims, submitted himself to the jurisdiction of the court and denied his individual liability, nor do we think there is any merit in appellant's contention that the court did not have jurisdiction of the subject matter. Our present Practice Act provides: ''Subject to rules any plaintiff or plaintiffs may join any causes of action, whether legal or equitable or both, against any defendant or defendants; and subject to rules the defendant may set up in his answer any and all cross-demands, whatever, whether in the nature of recoupment, set-off, cross bill in equity or otherwise, which shall be designated counterclaims. But the court may, in its discretion, order separate trials in any such causes of action or counterclaims if they cannot be conveniently disposed of with the other issues in the case. Legal and equitable issues may be tried together where no jury is employed.'' Section 44, ch. 110, Ill. State Bar Stats. 1935, ¶ 172; Jones Ill. Stats. Ann. 104.044. The record fails to disclose that appellant at any time ever sought to have a separate trial of the right of appellees to recover a money judgment against him personally. If he desired

a jury trial, the Practice Act provided how he could have secured one. He cannot now, for the first time, raise in this court a question which he did not present to the chancellor. It should not be overlooked that the original proceeding was properly commenced in equity, having for its purpose the cancellation of a 99-year lease and the title to the premises involved confirmed in the original complainant. To this complaint appellant, as well as appellees, was made a defendant. A court of equity properly acquired jurisdiction and it is a familiar principle that when a court of equity acquires jurisdiction for one purpose, it acquires it for all purposes and will retain the case to do complete justice between the parties and will determine all their rights, not only with reference to the matters directly in controversy, but as to all matters germane thereto. *Baker v. Salzenstein,* 314 Ill. 226.

Counsel for appellant next insist that no personal liability on the part of Clarendon Mower was intended or contemplated by the parties and that the acceptance of the assignment was by the trustees in a representative capacity only. In this connection counsel cite and rely upon the *Equitable Trust Co. of Chicago v. Taylor,* 330 Ill. 42. It appeared in that case that the instrument creating the trust expressly provided that the trustees should in no way be obligated personally in carrying out any provision of the agreement and that when the trustee applied for and procured the loan upon which the suit was based, he produced the instrument creating the trust and the creditor was fully apprised of its terms which limited the individual and personal liabilities of the trustees. The facts in that case are clearly distinguishable from the facts in the instant case. In *Austin v. Parker,* 317 Ill. 348, the court said: "The rule is well settled that a guardian, executor, administrator, trustee or other person acting in such relation in a contract with third persons binds himself

personally, unless he exacts an agreement from the person with whom he contracts to look to the funds of the estate exclusively: and this is true regardless of whether the charge is one for which the trustee may be reimbursed from the trust estate, as that is a matter wholly between him and the beneficiaries of the trust.'' Nowhere in the acceptance executed by Clarendon Mower did it provide for the release of his personal liability. It is argued by appellant that the bonds secured by the trust deed are dated May 1, 1929, that they are separate and apart from the contract and trust agreement of April 22, 1929, and that therefore the bonds were not, nor were they intended to be, an obligation under the contract and trust agreement of April 22, 1929, which appellant accepted. An examination of the several instruments will disclose that the assignment and acceptance were executed on October 12, 1929. At this time the liability of Max and Leona Liebling under the bond issue and under the outstanding note to Swords Brothers Company were fixed and definite in amount and terms and had been since May 1, 1929. The trust deed was a matter of record. In the contract and trust agreement of April 22, 1929, the amount of indebtedness and the terms and conditions of the trust deed securing the bonds were described and set forth as was also the obligation of Max Liebling and Leona Liebling to Swords Brothers Company, subject only to fixing the amount at a later date and whatever that amount was afterward determined to be was by the agreement of April 22, 1929 established as a lien upon the leasehold, junior only to the first lien of the Security First Mortgage Company. In our opinion, from the language of the assignment, consent and acceptance, the assignee in accepting the covenants, agreements, incumbrances and liabilities of the agreement of April 22, 1929 obligated himself to pay the indebtedness due to the Swords Brothers Company and

the indebtedness due upon the bonds issued under the trust indenture. The lien and the incumbrance of the Swords Brothers Company were created by the contract of April 22, 1929 and the lien and the incumbrance in favor of the bondholders were created and established by that agreement as well as by the trust indenture of May 1, 1929. Other conditions, agreements and obligations were imposed upon Max Liebling and Leona Liebling under this contract and trust agreement along with the indebtedness due appellees and the agreement to carry out and assume all of these conditions, incumbrances and obligations was the most direct manner in which such assumption could be undertaken. It has been held that where there is a conveyance of mortgaged property by the mortgagor to one who assumes and agrees to pay the mortgage debt by the provisions of the deed executed to them, that then both the mortgagor and grantee are liable to the holder of the note and mortgage as principals. *Webster v. Fleming,* 178 Ill. 140.

Counsel for appellant finally insist that the chancellor erred in refusing to admit in evidence a certain exhibit executed by Max Liebling, Leona Liebling and Clarendon Mower on July 17, 1929 and in refusing to admit in evidence conversations between Liebling, Mower and their agents, all held out of the presence of appellees or any one of them, and cites *Farmers & Merchants Bank v. Narvid,* 259 Ill. App. 554. It appears in the *Narvid* case that the mortgagee sued him on an assumption clause contained in the deed, wherein Narvid obtained title to the real estate by a deed from the mortgagor. Narvid was permitted to testify as to a conversation he claimed to have had with the mortgagor at the time the deed was executed, in which he stated he refused to assume and agree to pay the incumbrance. It appears that this conversation between the mortgagor and Narvid was held in the presence of

the mortgagee and for that reason was probably binding upon him. The rule is familiar that where parties to a contract have reduced their agreement to writing, parol evidence shall not be received to alter or contradict the written instrument. And this rule applies to controversies between the parties and those claiming under them and where there is no ambiguity in the terms of a written instrument, then the instrument itself is the only criterion of the intention of the parties and its construction is not open to oral evidence. *Fowler v. Black,* 136 Ill. 363. In our opinion, the intention of the parties to this assignment, consent and acceptance must be ascertained from the instruments themselves and the trial court did not err in his refusal to admit the proffered evidence.

Finding no error in the record, the decree of the circuit court will be affirmed.

*Decree affirmed.*